Filed 1/8/24  P. v. Sucaldito CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARMANDO PIDOT SUCALDITO,<br><br>    Defendant and Appellant. | D080824<br><br><br><br>(Super. Ct. No. SCE406276) |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Armando Pidot Sucaldito of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a); count 1), driving under the influence of drugs causing injury (Veh. Code, § 23152, subd. (f); count 2), and driving with a suspended driver's license (Veh. Code,

§ 14601.1, subd. (a); count 3). It found true allegations that he personally inflicted great bodily injury (Pen. Code, §§ 1192.7, subd. (c)(8), 12022.7, subd. (a)).

The court sentenced Sucaldito to four years in prison: the lower term of four years for count 1, and a concurrent six-month term for count 3. It dismissed count 2.

Sucaldito's sole contention is that there was insufficient evidence that he caused the death of the victim to support his count 1 conviction. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Evidence*

On September 23, 2020, at about 6:50 a.m., a motorist was driving westbound on Paradise Valley Road in San Diego County when a vehicle going in the same direction passed her on the left. Immediately afterwards, the motorist saw that vehicle going down a hill off the road. She immediately called 911.

At about 6:53 a.m., a California Highway Patrol officer was notified of the crash and arrived at the scene about one minute later. He saw a fence knocked down and a crashed vehicle at the bottom of a steep embankment. He went down the embankment and spoke to the driver, Sucaldito, who seemed distraught was outside the car and repeatedly said that his girlfriend, Luzviminda Marzan, was in the back seat of the car. The officer did not see anyone in the car. Sucaldito repeatedly said she was sleeping in the back seat, and she was not wearing a seat belt. The officer saw that Sucaldito's vehicle's windshield was shattered and had a large hole that was consistent with a person being ejected from it. He located Marzan's body

2

about 15 to 20 feet in front of the badly damaged vehicle.  Her body was still warm to the touch.

At approximately 6:58 a.m., a firefighter paramedic arrived at the scene and took Marzan's vital signs shortly after 6:59 a.m.  Marzan had no pulse and her pupils were dilated and nonreactive, which was indicative of cardiac arrest.  Her skin still felt warm.  The paramedic found no obvious signs of death such as rigor mortis or incineration.  He immediately began administering CPR.  At 7:02 a.m., he discerned some electrical activity of Marzan's heart, and therefore tried defibrillation.  At 7:17 a.m., she was pronounced dead.

The highway patrol officer went to the hospital to interview Sucaldito that morning.  Sucaldito said that before the accident, he had slept from midnight to 2:00 or 3:00 a.m., after which he and his girlfriend went to a casino.  The accident happened while he was leaving there.  As he was driving, he got really sleepy, and started nodding off.  He saw a flash of black and felt an impact and strong pain to his chest.  Sucaldito denied consuming any alcohol or drugs before the crash, but admitted using methamphetamine three days earlier.

Blood taken from Sucaldito at 7:25 a.m. on the day of the crash later tested positive for methamphetamine.  That day, Sucaldito told a social worker that he had been smoking methamphetamine in the car before the accident.

Postmortem samples of Marzan's blood tested positive for methamphetamine at a level that could be considered lethal for some individuals but not for others.  A toxicologist testified that methamphetamine can redistribute in the body post mortem, meaning the portions of the drug in surrounding tissues and organs may go back into the blood, particularly in

3

the area of the chest cavity. This can result in the level of methamphetamine being falsely elevated and reflect a higher measurement than the actual level at the time of death.

San Diego County Deputy Medical Examiner Dr. Robert Stabley conducted Marzan's autopsy. Marzan was 52 years old when she died. Dr. Stabley testified she had abrasions or scrapes on the head but no hemorrhage within her skull. She also had abrasions on her torso from the base of her neck to her pelvic area, a sternum fracture, 17 of 24 ribs fractured, bruises and lacerations on her lungs, a liver laceration, and a tear in her aorta that resulted in blood loss into her chest cavity. Marzan also had signs of natural disease, with one coronary artery having atherosclerosis or plaque obstruction of up to 75 percent of blood flow, and two other coronary arteries having 50 percent blockages.

Dr. Stabley explained that bruises and abrasions do not occur after a person's death because blood stops flowing immediately. If someone gets either bruises or abrasions on her skin after death, the wounds have a different appearance: "Because there's no blood flow in the skin, those abrasions usually appear yellow or yellow orange and might actually have a dry appearance around the edges." Dr. Stabley therefore concluded Marzan was still alive when she suffered the blunt force trauma. He likewise found that the bruising of her lungs and accumulation of blood in her lungs indicated they occurred when she was still alive. Dr. Stabley stated Marzan's fractured ribs could have affected her ability to breathe.

Dr. Stabley opined that the manner of Marzan's death was an accident. The primary cause of death was blunt force trauma based on the totality of the injury to her chest, but she might have died faster due to her methamphetamine use and coronary disease. He explained that her death

4

was due to a combination of multiple rib fractures and lung injuries. The prosecutor asked Dr. Stabley separate questions about the likelihood that Marzan died of a drug overdose or natural disease rather than blunt force trauma. He replied, "Highly unlikely" to each question. Dr. Stabley testified on cross-examination that he did not believe Marzan died of cardiac arrest before the crash because she had injuries that were not bloodless, meaning her heart was still pumping blood at the time of the crash.

B. *Defense Evidence*

Sucaldito testified that on September 22, 2020, at approximately 10:00 p.m., he smoked methamphetamine. Afterwards, he napped for about two hours in the car, while Marzan was smoking methamphetamine in the back seat. At about 3:00 a.m. he drove Marzan to a casino. They left there at about 6:30 a.m. He did not know if Marzan wore a seatbelt. She was lying down in the backseat because she had chest pains and a headache. When he talked to her, she did not respond; therefore, he thought she was sleeping. Just before the accident, he turned around to look at her and asked her a question, which she did not answer. When he turned back to look at the road, he "just saw black," and the crash occurred.

On cross-examination, Sucaldito admitted that he never told the police officer or medical personnel that in the minutes before the accident, Marzan was not feeling well and had asked for medication. He agreed that this information would have been important for the medical personnel to know while they were treating Marzan.

Forensic pathologist Dr. Todd Grey testified based on defense counsel's hypothetical paralleling the facts of this case. He concluded Marzan probably died from methamphetamine intoxication and underlying coronary disease. He stated the blunt force trauma and associated injuries she suffered would

5

not have killed "an otherwise healthy person" as rapidly as Marzan actually died. Instead, Dr. Grey stated he would expect her to still have electrical activity of the heart or to be gasping for air in the minutes after the crash. He opined that Marzan was likely already dead from methamphetamine intoxication before the collision.

On cross-examination Dr. Grey specified that in a healthy person, he "would likely expect it to be probably at least 10 minutes before there was absolutely no signs of any kind of reactivity" following the victim's injuries in the car crash. When asked how that timeline would change if the victim had an underlying heart condition and had consumed methamphetamine, Dr. Grey agreed the time frame would drop to around eight minutes after the accident.

C. *Jury Instructions*

The court instructed the jury with CALCRIM No. 590 on the elements of gross vehicular manslaughter while intoxicated: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant drove under the influence of a drug; [¶] 2. While driving that vehicle under the influence of a drug, the defendant also committed an infraction; [¶] 3. The defendant committed the infraction with gross negligence; and [¶] 4. The defendant's grossly negligent conduct caused the death of another person."

The court instructed the jury with CALCRIM No. 302 on how to evaluate conflicting evidence and decide what evidence, if any, to believe. It also instructed with CALCRIM No. 332 that when there is conflicting expert testimony, the jury "should weigh each opinion against the others [and] examine the reasons given for each opinion and the facts or matters on which each witness relied." It instructed the jury with CALCRIM No. 360 that in

6

considering Dr. Grey's reliance on Sucaldito's statements, it "may consider those statements only to evaluate [Dr. Grey's] opinions" and not "as proof that the information contained in [Sucaldito's] statements is true."

D. *Closing Arguments*

The prosecutor argued to the jury that it had to decide between two different versions of what caused Marzan's death: "Because you get to decide what the facts are in this case, you essentially get to decide which version of the events is true. And you were presented with two different versions of events. [¶] Version number one, [ ] Sucaldito was not under the influence. He was just sleepy, which had nothing to do with crash effects that happened in smoking methamphetamine. He had an unexpected medical emergency or unexpectedly lost consciousness or unexpectedly blacked out without any explanation. [¶] He drives off the side of the road and immediately after [ ] Marzan had an unexpected, unexplained, unsubstantiated medical emergency as well. And in fact, she had already died before she's ejected through the windshield. [¶] Or version two, that [ ] Sucaldito smoked methamphetamine. After experiencing stimulating effects of methamphetamine, he experienced the crash effects of methamphetamine. and he displayed the signs and symptoms consistent with being under the influence during the crash of methamphetamine. [¶] He blacked out or lost consciousness, he drove off the side of the road and ejected his passenger, and it was due to the blunt force trauma injuries from being forcibly ejected through a windshield that [ ] Marzan died."

The prosecutor continued: "The real question is do you believe Dr. Grey[?] [¶] You get to consider his ability to see, hear, or perceive the events about which he testified. He did not perform the autopsy in this case. He did not see it live. He did not see [ ] Marzan's body. He was limited to the report

7

and to the photographs provided to him. [¶] You get to consider his ability to remember and describe events. Dr. Grey could not remember what all he was asked to review to form his original written opinion and his opinion here in court. [¶] You get to consider whether he is influenced by bias, prejudice, or a personal interest in this case."

The prosecutor also argued that the paramedic detected Marzan's body warmth and electrical activity from her heart within the seven to eight minutes that Dr. Grey believed was reasonable for a victim to still show signs of life after the vehicular accident.

Likewise, defense counsel in closing arguments highlighted the experts' conflicting evidence: "Dr. Grey looked at all the evidence, and he sees meth[amphetamine] toxicity with heart disease as the cause of death. And Dr. Stabley looked at it and saw respiratory compromise caused by blunt force trauma contributed to by meth[amphetamine] toxicity and heart disease. These are both experienced, reasonable doctors, who came to knowledgeable, reasonable conclusions."

Defense counsel argued that if the jury found that Marzan "reasonably could have died from her methamphetamine use and her bad heart, then [ ] Sucaldito is necessarily not guilty of count[ ] 1 and all the lesser included offenses. Because all of the lesser included offenses of manslaughter require that he specifically caused the death."

## DISCUSSION

In challenging the sufficiency of the evidence to support the causation element of his conviction for gross vehicular manslaughter while intoxicated, Sucaldito specifically relies on Dr. Grey's testimony that Marzan died before the vehicle crashed due to methamphetamine intoxication and coronary artery disease.

8

## I. *Applicable Law*

We examine the merits of this contention according to well-established principles governing our review. "To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] . . . In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] . . . A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact's decision.] [Citation.] [¶] The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

## II. *Analysis*

It was the jury's exclusive role to determine the truth or falsity of the determinative facts. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.) Dr. Stabley's testimony supported the jury's verdict. Having performed the autopsy, he concluded Marzan died from blunt force trauma from being forcefully ejected from a moving vehicle. He concluded she broke several ribs, making it difficult for her to breathe. As she developed several bruises and lacerations, he opined that her blood was still circulating when she suffered the blunt trauma, and she died afterwards. He specifically rejected the proposition that Marzan died from methamphetamine intoxication or coronary disease, although he concluded those were contributory factors that could have hastened her death.

The jury by its verdict agreed with Dr. Stabley's analysis of the cause of death and rejected Dr. Grey's position. Under the applicable standard of review set forth above, we may not disturb their findings. "Our duty begins and ends with the determination as to whether there is in the record evidence, contradicted or uncontradicted, of sufficient substantiality to warrant the conclusion arrived at by the [jury]." (*People v. Rodriguez* (1955) 132 Cal.App.2d 335, 338.) As stated, the prosecutor and defense counsel in closing arguments framed this case as one involving expert witnesses with conflicting opinions regarding Marzan's cause of death, an issue that the attorneys thoroughly argued and explored. Defense counsel was able to cross-examine Dr. Stabley and impeach his credibility. To aid the jurors, the court properly instructed them that they were to consider the experts' opinions, but were not required to accept them as true or correct. They were to decide what meaning and importance to give any expert opinion, and take into account a number of specific factors when evaluating each expert's

10

credibility. The jurors were informed they could disregard any expert opinion they found unbelievable, unreasonable or unsupported by the evidence. Finally, the jurors were instructed with CALCRIM No. 332 on how to weigh each expert's opinion against the others. "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 196.)

## DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.

11